UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,  )
                           )
   PLAINTIFF,              )   CASE NO. 2:22-cr-117(6)
                           )
        vs.                )
                           )
TYLER BOURDO,              )
                           )
   DEFENDANT.             )
_____)


TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
MONDAY, MARCH 3, 2025; 1:33 P.M.
COLUMBUS, OHIO

APPEARANCES:

   FOR THE PLAINTIFF:
        United States Attorney's Office
        By:  Timothy D. Prichard
             Emily Czerniejewski
        Assistant United States Attorneys
        303 Marconi Boulevard, 2nd Floor
        Columbus, Ohio 43215

   FOR THE DEFENDANT:
        Peterson Conners LLP
        By:  Rasheeda Z. Khan, Esq.
        545 Metro Place, Suite 435
        Dublin, Ohio  43017

        Eastman Smith Ltd.
        By:  Todd A. Long, Esq.
        250 Civic Center Drive, Suite 280
        Columbus, Ohio  43215

- - -

    Proceedings recorded by mechanical stenography, transcript produced by computer.


CRYSTAL HATCHETT, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD
COLUMBUS, OHIO  43215
(614) 719-3245

2

MONDAY AFTERNOON SESSION

MARCH 3, 2025

- - -

(The following proceedings were had in open court.)

THE COURTROOM DEPUTY CLERK:  Case No. 2:22-cr-117, Defendant No. 6, United States of America versus Tyler Bourdo.

THE COURT:  Counsel, good afternoon.  Starting with the government, please enter your appearances.

MS. CZERNIEJEWSKI:  Good afternoon, Your Honor.  Emily Czerniejewski and Tim Prichard on behalf of the United States.

THE COURT:  Good afternoon.

MS. KHAN:  Good afternoon, Your Honor.  Rasheeda Khan and Todd Long on behalf of Tyler Bourdo.

THE COURT:  Good afternoon to all of you.

Ms. Czerniejewski, would you please recite the status of this case.

MS. CZERNIEJEWSKI:  Your Honor, on March 13th, 2024, the defendant entered a plea of guilty to a superseding information that charged him with three separate charges of violation of federal law.

The first was conspiracy to distribute and possess with intent to distribute controlled substances within 1,000 feet of a school; the second, distribution of fentanyl and cocaine base resulting in death; and, third, conspiracy to commit sex trafficking.

That was pursuant to a Rule 11(c)(1)(C) plea agreement, which called for a term of incarceration between 240 and 300 months.

We're here today for sentencing on the matter.

THE COURT:  Thank you.

Mr. Bourdo, please stand.

There's a lengthy document in this case known as the presentence investigation report.  Have you received a copy of that document?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you had plenty of time to read it and review it with your counsel, Ms. Khan and Mr. Long?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You may be seated.

There are several objections that are noted in the presentence report that we will first resolve.  We will take them one at a time, and they're each lodged by the defense.

The first objection has to do with acceptance of responsibility, which is not credited to the defendant in this case.  Ms. Mueller has determined that because there's also obstruction of justice, which is otherwise unrelated.

Under the guidelines, it's unusual for a defendant to receive an enhancement for obstruction of justice and then, on the other hand of the ledger, receive a credit for acceptance of responsibility.

4

I think, Ms. Mueller, that's essentially your point. Is that a fair summary?

MS. MUELLER:  That's correct, Your Honor.

THE COURT:  All right.  So, Ms. Khan, you may speak to that.

MS. KHAN:  Your Honor, what I would just add, in addition to what I have already explained in the sentencing memorandum, is that the conduct that gave rise to withholding that acceptance of responsibility happened long ago and that this is a detailed -- extraordinarily detailed plea agreement that requires him to admit to a significant number of facts.

And under those circumstances and the fact that he's pled over a year ago and hasn't done anything to -- anything that would be inconsistent with that, we think that we would carry the burden that would allow for him to receive acceptance of responsibility.

THE COURT:  All right.  Thank you.

Ms. Czerniejewski, your view?

MS. CZERNIEJEWSKI:  Yes, Your Honor.  The government just takes issue with the reason for the nonapplication because the obstruction portion occurred in 2021, significantly prior to the presentation of the plea agreement and the admission of the facts.

Obviously, the government has supplemented numerous instances of concern in the sentencing memo related to his

5

continuation -- his continuation to accept responsibility for what he has done; but as it relates to the reason outlined in the PSR, we would submit that that three-level acceptance of responsibility decrease be applied.

THE COURT:  All right.  Well, just by way of history, the original guideline for obstruction had a much different timeline to it.  It was to prevent the ongoing nature of a case.  This was before the case was filed, but the guideline is now broad enough to cover it.

But there is sort of a disconnect here between the obstructive conduct and the acceptance.  I think that's what both sides are urging me to consider.  Would that be fair?

MS. CZERNIEJEWSKI:  That's correct, Your Honor.

THE COURT:  All right.  Once again, I think you have it right on the probation office side.  It's not going to affect the guideline range ultimately in this case, or the agreed upon range.

So I am going to, by agreement of the government and the defense, sustain the objection.

The second has to do with a two-level enhancement for maintaining a house in which drugs were sold.

You may address that, Ms. Khan.

MS. KHAN:  Your Honor, we have withdrawn the balance of the objections.

THE COURT:  All right.  So we have covered the one

6

that's still in play, and the rest of these are withdrawn?

MS. KHAN: That's correct, Your Honor. Yep.

THE COURT: All right. I also want to refer to the plea agreement the parties have signed. I have not accepted it yet, but I'm about to. I assume each side still wants to be bound. The agreement is that the sentence imposed will not be lower than 240 months, which is 20 years, and also not higher than 300 months, which is 25 years.

All right. So I'm accepting that, and you can assume the sentence will be in between that range.

Before we turn to anything else -- and, Ms. Mueller, I'm going to look to you for some help here. I just sustained the objection. Does the guideline range stay the same?

MS. MUELLER: It does, Your Honor.

THE COURT: All right. So that's the final computation of the guideline range.

And then we'll turn to issues of allocution. We'll start with the defense.

MS. KHAN: Thank you, Your Honor.

I think that the detailed sentencing memorandum and the psychological report and the overwhelming amount of records and documentation showing his upbringing -- he was raised by addicts. He was raised in chaos and instability and violence, and those are the tools that he knew. And I think from the very beginning he's been very open about: Drug trafficking was

the one thing I knew, that I was good at doing, and I didn't have any confidence about being able to do much else.

That, coupled with the fact that he had been with this same group of guys, other members of the DTO, for a number of years, and that those people, Pat and Dub, the other guys, that was his family. He saw Pat as a father figure, a brother. They spent holidays together before he was arrested. Pat had got him a birthday cake with all his childhood pictures on it.

This was his family, and he wasn't going to -- he was going to do what he could to maintain his position in that. He didn't -- he wasn't out to manipulate anybody or terrorize anybody. His efforts were to maintain the status quo.

We have got a lot of -- we have had a lot of healthy debate about the conduct that Tyler is involved in. We stick to what's in that statement of facts. But all the other stuff, it's uncharged conduct, it's rumors, and we maintain that it's not true. Or at the very least --

THE COURT: I'm sticking with two things: The statement of facts in the plea agreement and the presentence report.

MS. KHAN: Thank you.

THE COURT: That's the limit of the facts.

MS. KHAN: Thank you, Your Honor.

And this certainly was a very long and difficult pretrial detention for him, and I know that the government has

taken a lot of issue with the communications that he maintained with some of the co-defendants and other folks wanting to talk about his case.  I would simply say that it was his family.  He felt an uncontrollable need to continue those communications.  It wasn't in an effort to terrorize anybody, but this is, in his view, all that he had.

As the Court is aware, he had family members that were close to members of the DTO as well.  I'm not offering it as justification, but that it certainly should provide some context in who he is and why he did what he did.

With respect to the unfortunate death of Sarah Burris --

THE COURT:  S.B.

MS. KHAN:  S.B.

THE COURT:  And that will be on the record as S.B.  Thank you.

MS. KHAN:  I'm sorry, Your Honor.  We had just seen that there would have been some issue taken with using the initials.  I'll continue to doing that.

THE COURT:  Ms. Czerniejewski, the government's view is initials?

MS. CZERNIEJEWSKI:  That's correct, Your Honor.

THE COURT:  We'll just leave initials.

MS. KHAN:  Understood, Your Honor.

THE COURT:  We're not going to dehumanize her; but on

the other hand, it's a private name.

So go ahead.

MS. KHAN: Tyler accepts responsibility for providing -- for stocking the house that served her, but this was his friend. He was an addict -- is an addict as well, and this is something that he has tremendous remorse for. But at the same time, he has difficulty understanding that because he wasn't the one that served her and because he actively told others not to serve her, that he's taking the hit; and he's willing to do that.

And I think similarly with respect to the sex trafficking. He understood that women were paying for their drugs by engaging in sexual activities, but that it was -- he didn't see that as manipulation. He didn't see it as force. He didn't advertise these women. He didn't engage in sex with these women. He didn't force them to do this directly.

We understand that the coercion and the manipulation comes through providing drugs, but, again, we're asking the Court to understand this in the context of the entire DTO. He's somewhere in the middle. He was never at the very top. He's somewhere at the middle.

Tyler has engaged in some significant amount of programming at the jails. He wishes for that opportunity to continue the same.

And we believe that in light of the tremendous amount

of facts that he's already admitted to, in comparison to the other sentences that other folks have gotten and will get, we believe that 240 months is more than adequate.

We would also submit, as explained in the PSI, that he did serve two years that was considered relevant conduct. I spoke to Ms. Mueller. She has taken the position -- and I don't disagree with her -- that this is more of a request for a variance in light of him serving the two years for relevant conduct, as opposed to direct grounds for departure under --

THE COURT: Just so I'm clear.

MS. KHAN: Yes.

THE COURT: In other words, your argument is that he has been in jail rather than prison and that I should consider that as a factor?

MS. KHAN: No.

THE COURT: No? Go ahead.

MS. KHAN: He was in prison for a prior offense that was counted as zero, but he did -- he completed the two years.

THE COURT: And, Ms. Mueller, your view on that?

MS. MUELLER: The guidelines don't address these particular circumstances. The guidelines only address when there's an undischarged term of imprisonment or anticipated term of imprisonment.

THE COURT: Right.

MS. MUELLER: But he did serve two years in state

prison. Those two offenses were not given criminal history points because that was relevant conduct.

THE COURT: It was part of the conspiracy in this case?

MS. MUELLER: Correct. Correct.

THE COURT: So we're not going to double count that.

MS. MUELLER: Correct.

But the Commission and the guidelines don't give any direction in terms of how the Court should consider when that time has already been discharged.

THE COURT: Just to be clear. So your position, Ms. Khan, is I should consider those two years as part of this case?

MS. KHAN: That's right.

THE COURT: And, Ms. Mueller, you take a different view?

MS. MUELLER: I just know that there's no guidance from the Commission in the guidelines in terms of how that should be handled. But if the Court does want to consider it, it would be a variance.

THE COURT: There's nothing that prohibits it, but there's nothing that -- if this were an undischarged sentence, there are guidelines on that.

MS. MUELLER: Correct.

THE COURT: But this is a discharged sentence.

12

MS. MUELLER:  Correct.

THE COURT:  Thank you.

MS. KHAN:  I would just add, Your Honor, that Application Note 5 allows for a downward departure by the Court.  It's not a mandatory; it allows for it.

THE COURT:  Understood.

MS. KHAN:  We would submit it's appropriate.

THE COURT:  All right.  Thank you.

And, Mr. Bourdo, you are not required to speak, but you have a right to if you wish.

THE DEFENDANT:  Your Honor, I just want to say that I want to apologize to S.B.'s family.  You know, I never -- never intended on anybody to get hurt, but it happened.  You know, I carry around a tremendous amount of remorse and guilt for that -- excuse me.  Excuse me.

I just want to take the time that I'm about to receive and use it to become better so that, you know, when I'm released, that no matter what situation that, you know, I'm faced with, I'll be able to overcome it so I don't have to live like this no more.

THE COURT:  All right.  Thank you.

Ms. Mueller, as I turn to the government, because there was a "death caused by" in here, there wasn't a computation of the drug quantity.  I thought it might be prudent if you put that on the record.

13

Do you have an estimate of that?

MS. CZERNIEJEWSKI: I do. If I could have just one moment.

Your Honor, in calculating initially the guidelines for Mr. Bourdo, we had him involved in the case from approximately January of 2021 through June of 2022. Our intel -- and I'm about to go through a lot of math, but I worked it out, so just bear with me. And I think some of this is mapped out in my sentencing memo.

The packs that were distributed by this group contained 10 grams of fentanyl, 10 grams of crack, and 10 grams of powder cocaine, distributed approximately four times a day. So that's 40 grams of each substance.

There's 30 days in a month, so we have approximately 1,200 grams a day of drugs going out over the course of 17 months, which approximates in converted drug weight to 20,400 grams.

When you do the conversion --

THE COURT: You're doing the conversion. Let's do the drug before we convert it to the bulk.

MS. CZERNIEJEWSKI: All right. So I have approximately 51 kilograms of fentanyl that this defendant is responsible for, 72,848 grams of crack cocaine, and 4,080 kilograms of powder cocaine.

THE COURT: Now, that's not in the presentence report

14

because the guidelines weren't calculated using those numbers as they would normally be in a drug case.  I just don't want this to be -- if it's disputed, let me know.

Ms. Khan, do you disagree with those numbers?

MS. KHAN:  I don't think we disagree with those numbers, Your Honor.

THE COURT:  All right.  Thank you.

It doesn't drive the sentence the way this case is teed up, but I just thought we would have some idea of the quantity here.

MS. CZERNIEJEWSKI:  Yes.

THE COURT:  That's all I had.  Thank you.  Go ahead.

MS. CZERNIEJEWSKI:  Your Honor, before we begin with any argument portion of this, I do have two family members of S.B. who are here today and wish to speak.

THE COURT:  That's fine.

MS. CZERNIEJEWSKI:  If we could begin with the sister of S.B.  Her first name is Kristin, K-r-i-s-t-i-n; Burris, B-u-r-r-i-s.  And I'll ask her to come up.

THE COURT:  Thank you.

First, good afternoon.

MS. BURRIS:  Good afternoon.

THE COURT:  Thank you for being here.  I'm very sorry about your loss.

MS. BURRIS:  Thank you.

15

MS. CZERNIEJEWSKI: Your Honor, before we begin, this victim impact statement was written with S.B.'s first name in it. I just spoke with her. She would like to personalize her and call her by her first name.

THE COURT: Sure, whatever the family prefers. We can keep her name anyway you like it.

MS. BURRIS: I'm sorry.

Good afternoon. I first want to thank Your Honor for allowing me to speak on behalf of my family. Specifically, my sister. I am actually a stenographer at one of the courthouses here in Franklin County, so being on this side of the courtroom is new for me, and it gives me a whole new appreciation for the victims who speak. It is nerve-wracking, but only because I want to do my sister justice. I want to make that very clear.

In the documents pertaining to this case, you may all have seen the initials S.B. many different times. Those initials stand for Sarah Burris, and she is much more than just initials in a plea agreement.

Addiction was part of her story, but it does not define who she is. This awful disease may have taken her from us too soon, but I want to remind everyone, including the defendant, of exactly who she was. She was kind, incredibly smart, witty, talented, beautiful, and an ambitious human being.

"Human being" being the keyword here. This is

16

something that Mr. Bourdo did not conceptualize, is that my sister and all of his other victims are human beings. He took advantage of a very vulnerable population and selfishly profited from them.

Mr. Bourdo, you admitted to supplying the house with these tainted drugs. Do you know what chemicals were in this batch that you supplied? I can refresh your memory if you don't know. This is what showed up in my sister's autopsy: Her cause of death was a combination of cocaine, fentanyl, fluorofentanyl, and xylazine.

Do you know what xylazine is? It's an animal tranquilizer not approved for humans. This mixed with fentanyl is especially deadly, causing the heartbeat to slow down and blood pressure to rapidly decrease, slowing down the breathing.

I would be naive to excuse my sister's actions completely. However, she was the vulnerable one here; you were not, Mr. Bourdo. You had a hand in my sister's death, and I hope that sits on your conscious for the rest of your life. Or lack of conscious, I might add.

I say this because you claim to have cared about my sister; but when she was alone in an alley, all you were worried about was getting her phone off of her dead body so she wouldn't -- so you would not get caught up in this.

Once you heard the sirens coming, you ran off and failed to get her phone, again leaving her alone. Someone

dragged her out to the alley and left her there all alone, and all you were worried about was yourself.

I will never believe that you cared about her, at least not in the way that she deserved. I am grateful that you ran off because little did she know at the time, she would be solving her own case.

This is not the only incidence where you showed a lack of conscious. I will read this directly from your plea agreement: The investigation revealed that Bourdo created a climate of fear in the DTO houses he operated by being violent or physically assaulting the drug runners and/or the drug purchasers who stole from him or owed him a debt. For example, on April 26th, 2022, Bourdo distributed a video of himself to a family member. This video depicted Bourdo slapping a drug-addicted male. Bourdo then sent out follow-up texts bragging about how hard he hit the addict and making jokes about it.

A paragraph down it also states: In addition to the above, between 2018 and 2022, Bourdo and other members of the DTO forced and/or coerced adult female drug addicts into performing commercial sex acts by providing, withholding, or threatening to withhold controlled substances and lodging.

It also states that you would front these women block hits to prevent them from going into active withdrawals so that they would be able to actively participate in the sexual acts

18

required by you.

I know I don't need to reiterate these heinous acts that you committed because you were well aware, but it needs to be said out loud in court for everyone to hear. It needs to be known that my family knows what horrible things you did to my sister and other addicts.

I do not feel sorry for you. I only feel sorry for your mother and your daughter. You will now be missing out on major parts of your daughter's life due to the decisions that you have made.

You won't see her graduate high school, go to prom, walk her down the aisle, or simply be a present father in her life. You may be able to visit her and have phone calls and video visits, but don't forget that you had a hand in taking that opportunity away from my sister's daughter.

While you get three hots and a cot, my sister is laying 6 feet under.

My niece was 6 years old when she lost her mother. A 6-year-old girl wrote on her mother's headstone that she wishes she had more time with her mother, but the reality is that she will never have more time with her mother.

You also had a hand in taking away the hope I had for us to be sisters again -- she was my only sibling -- to be able to watch movies again with each other, Facetime each other, and spend holidays together. But, thankfully, for the four months

she was clean prior to her death, we made amends and we were able to have the conversations I had been dying to have with her. I believe God knew what he was doing by this.

One last thing. She doesn't have the opportunity to know her niece, my daughter, who I named after my sister. She won't be able to give her too much candy, play games with her, teach her cuss words -- which she would probably do -- or take her to the park.

Something you don't know is actually how selfless she was and how much she loved kids. She helped me believe in Santa until I was 10 years old because she wanted me to be happy.

She and I didn't speak a lot over the last five years before she passed except for those four months, but I always had the hope one day that I would be able to when she was alive. Again, that hope has been taken away from me.

Not only was she there for her family, but she would also want to be there for literally anyone who needed help. Countless people reached out to my mother and I noting how incredible she was and how she transformed their lives.

You will get what you deserve with whatever sentence the Judge hands down to you, Mr. Bourdo.

I do not ask for leniency, as Mr. Bourdo did not provide any empathy or mercy for these men and women.

The only thing I hope for you, Mr. Bourdo, is that you

reinvent yourself and that you make yourself a decent person for your daughter, because you weren't one for the people you surrounded yourself with.

There's so much more I could say, but nothing will bring my sister back. All we can do is remember who she was at her core, and I wanted the Court to know how loved she was. And even after her death, I will always have her back, just like she had mine.

Thank you.

THE COURT: Again, thank you for being here.

MS. BURRIS: Thank you.

MS. CZERNIEJEWSKI: Your Honor, next is the statement of Sarah's mother, Rhonda. And she has asked me to read this on her behalf.

THE COURT: That's fine.

MS. CZERNIEJEWSKI: The day has finally arrived, justice served to the person who gave my daughter the lethal dose of fentanyl that took her life.

This statement has taken me a considerable amount of time to write because there's no words that can adequately describe the loss of a child. The loss is so deep, so permanent, and brings complete devastation. It is an immeasurable agony that does not go away.

I am unable to read this today because even after three-and-a-half years, I cannot say Sarah's name without

21

instant tears flowing.  Every single day is hard.  Every single day I cry.  Many days I cry shortly after I wake up because the cold hard reality hits me in the head immediately.

I realize I will never see her sparkly, most-beautiful blue eyes I have ever seen; and I will never get to see that brilliant smile, hear her sweet sound of laughter, feel her touch.  Never will I get to hug my daughter again, and never will my ears hear and my heart hear her say, "I love you, Mom."

I dread going to sleep at night because I know what the morning will bring.  I am not the same person I was before Sarah passed away.  I will never be the same again.  Life just isn't the same without Sarah here.

On October 14th, 2021, at approximately 10:15 a.m., I received, quote, that call.  For years this was a call I thought I might get some day.  This was a call I thought about, I was prepared for, but definitely not this.

This has been an incredibly long, painful three-and-a-half years for our family.  I'm grateful we are here today to witness at least a little bit of justice served to you, Tyler Bourdo.  Whatever sentence you receive today will never be enough to compensate what you took from our lives.  Your evil actions and greed for money stole my firstborn child, the real first love of my life, my daughter, Sarah Michelle Burris.

You took my other daughter's only sibling from her.

You robbed her of having a relationship with her only sister. You robbed Sarah's child of having a mother. You robbed Sarah's niece of having the best aunt in the world, and you took away one of the most intelligent, beautiful, empathetic, and courageous people I have ever known.

I do know you are not fully to blame for Sarah's death. Every single person in the now-crumbled drug trafficking organization had a part to play in her death. But you, Bourdo, you are the one who has admitted to handling the drugs that were lethal to Sarah.

I also know this act was intentional because someone found out she was talking to the police. Don't think for a minute I don't know that. It will never be a proven fact, but just know that I know. You murdered my daughter.

Remember the saying "What goes around, comes around." It's a very good thing you will be caged, and I mean incarcerated, for many years. I come from a generation where justice is sometimes served from the family rather than the justice system, and your actions are evil.

Your attempt to remove the cell phone from my deceased daughter in the alley is beyond despicable. You were trying to cover your ass, and thankfully you didn't make it down to the alley in time.

Your offer to pay for Sarah's headstone the day after her death is beyond disgusting. I want you to pay restitution

23

for her entire funeral cost now because it is your fault we had to have a funeral for Sarah.

Your mere existence is repulsive in this case, and you better hope your own child or family member never crosses paths with someone like you.

I hope you receive the maximum sentence for killing my daughter, and I hope you spend the rest of your life in prison.

Sarah was 29 years old when she was killed by Tyler Bourdo. She had a drug addiction that began when she was 16 years old. Her family fought this battle with her. But after a 13-year war, she was taken from us by Mr. Bourdo.

Sarah was smart, ranked 8th in her class sophomore year, athletic, generous, compassionate, just an extraordinary child. In elementary school she participated in a food drive and worked so hard on this, she was recognized as the top collector and our local newspaper wrote an article about her exemplary work. She won the 5th grade county spelling bee. She was a Girl Scout. She ran cross country and track. She was the field commander in the high school band. She was so much more than what Bourdo and the rest of the people who fed her addiction made her out to be.

Sarah made numerous attempts to get clean and stay clean, but she was unsuccessful. She did not want to be addicted to drugs, to live that lifestyle.

I was fortunate enough to talk with her almost every

24

day during the last four months of her life. I genuinely saw a change in her and felt in my heart that this time this was finally it. She wanted to stay clean, and I felt closer to having her back than ever before. We had amazing conversations, laughs, and cries, and there was so many things we needed to hear and tell each other. I will be forever grateful for that time with her.

Even though she was gone from our home the majority of the time during the 13-year battle, she would always be welcomed with open arms when she was clean. She knew our home was always her home, and she knew we loved her.

We always stayed in contact with her one way or the other. Some days I would go to the area I heard she was in to look for her, and sometimes I was lucky enough to see her, but most times I did not.

It was comforting knowing she was almost always just a phone call away, but now that is not the case. I can never call her again. I can only see pictures of Sarah and visit her gravesite.

As a mother, I will forever feel like I failed her. I should have been able to save her. Sarah would not have died that day if Tyler Bourdo's actions were not malicious and devious. Her story did not have to end this way, and it did.

Yes, Sarah was an addict who purchased drugs from Tyler Bourdo, but I know she did not want to die.

25

I will be forever grateful for every person who worked on this case and demolished the drug trafficking organization. The lives of thousands of people have been saved by hard work and dedication to this war on drugs.

I am thankful and so proud of Sarah for being brave enough to help stop these monsters from harming anyone.

I was hoping today would bring some closure to me, but it doesn't change the outcome. Sarah will never come back, and I have realized that there will be no closure. The hole in my heart will be there forever. I thought it would get easier with time, but for me it only gets worse. The wound is so deep, and it only gets deeper. Most days I don't want to get out of bed, but I know I have to because I know Sarah would not want me to give up on the rest of our family.

No one can understand the anguish and pain unless you have lost a child. I loved her to the end, just as much as I did the day she was born. Sarah was a strong, brave, and valiant warrior who deserved a life of peace and happiness.

THE COURT: Would you like me to read it?

We can wait.

MS. CZERNIEJEWSKI: I just need one more minute. I'm sorry.

It outrages me to think of the horrific things she experienced and witnessed at the hands of Tyler Bourdo and his fellow drug dealers. The ever so small amount of peace I can

have with her death is knowing no one can ever harm her again and that she is finally at peace.

I will miss her every day for the rest of my life and will keep her memory tucked safely in my heart. I will continue to march on in this life until I see my daughter again.

Signed, Rhonda Burris, the mother of Sarah Michelle Burris.

THE COURT: Okay. That's helpful. Thank you.

MS. CZERNIEJEWSKI: As it relates to this case, Your Honor, there is an agreed range, and it's between 20 and 25 years, so there's some certainty that this range brings to the family. But I want to argue to you -- and I have outlined almost all my arguments in my sentencing memo -- about why the top end of this range should be imposed, the 25 years.

And I know we're essentially arguing over five years here, but the five years truly matters in a case like this because of who this defendant was and who he continues to be.

THE COURT: So you have educated me in the length. This is a long case. We did a four-week trial, not with this defendant, but with people associated with him. One of the hardest things, as you know, is to get this right with regard to who fits where in a 22-defendant drug trafficking organization.

MS. CZERNIEJEWSKI: That's correct.

THE COURT: So this is the second case where someone has died.

MS. CZERNIEJEWSKI: That's correct.

THE COURT: The first one was this morning. And I know Ms. Khan and Mr. Long hadn't had the benefit of seeing that presentence report, but this was also a death. Probably more from an assault than from drugs, but the same kind of ugly ending with a drug trafficker who was maybe slightly below the level of culpability of this defendant.

So where would you put him in this pecking order?

MS. CZERNIEJEWSKI: Your Honor, I know this will come as no surprise to Mr. Bourdo or his attorneys, but we have always said that he is directly below Mr. Pat Saultz and Mr. Cordell Washington.

THE COURT: He was in the second tier?

MS. CZERNIEJEWSKI: He was the right-hand man to them both, and we had the opportunity to realize that when we intercepted the four phone lines from Mr. Bourdo -- from Mr. Washington and Mr. Saultz, and their number one communication was with Mr. Bourdo. He was quite literally the right-hand man.

THE COURT: So he is one level above our defendant this morning.

MS. CZERNIEJEWSKI: I would say more than that.

THE COURT: More than that.

28

MS. CZERNIEJEWSKI: He oversaw the drugs that the individual this morning was distributing. He supplied Mr. Speakman with the drugs to further distribute, but he also ran multiple houses at the same time.

THE COURT: All right.

MS. CZERNIEJEWSKI: One of them being 90 North Warren.

So when we talk about levels of culpability, I would say that there have been approximately probably five sentencing hearings before Your Honor where the individual that is being sentenced is at the top tier, and this is one of them.

I think Ms. Khan described our conversations about the charges in this case as spirited, and I agree with that. We have had a lot of going back and forth.

But what I want to note here is that there is -- appears to be remorse. There appears to be an admission to these facts. We signed the plea agreement. We did these things, but always with a little bit of a caveat, and that's where I think it's important to recognize what actually happened here today.

Your Honor had the luxury of sitting through an approximately four-week trial, and you heard about the manipulation of this drug trafficking organization. You heard about how they took addicts, maximized the profits they could make off of them, and that included, in Sarah's case, S.B.'s case, and even Jane Doe's case, the victim of the sex

trafficking charge, manipulating them to engage in sex acts.

Sarah was one of the sex workers we learned about in this case. Ultimately, she would go, she would work at 90 North Warren, she would be provided drugs, she would be required to go out and hit the block -- as we know, that means working on Sullivant Avenue -- and then come back and either pay off a drug debt or buy more drugs to feed her addiction. She was very well-known among the drug trafficking organization.

So when we talk about her overdose death, she was a key piece of actually building the investigation against this group, and eventually the DTO came to realize that.

What I'll note is, while Mr. Bourdo -- I should say -- let me rephrase this.

While I do not have direct evidence -- the government and the investigation has never revealed who actually handed her the drugs the day she died -- Mr. Bourdo was part and parcel to the reason she died.

THE COURT: That's not the legal standard, right?

MS. CZERNIEJEWSKI: That's not the legal standard.

THE COURT: He has to be part of a conspiracy that ends up killing her.

MS. CZERNIEJEWSKI: Correct, the chain of distribution.

He was at the top. 90 North Warren was overseen by

30

Tyler Bourdo. He supplied that house with packs of drugs, fentanyl, cocaine, crack cocaine, every single day for further redistribution.

I want to break down a little bit the timeline, and I did this a little bit in the statement of facts in the plea agreement, but I think it's important to recognize here his actual role and what he knew and how we know that.

On October 10th, 2021, S.B. was discharged from the hospital for an unrelated incident. At the time that she was discharged -- again, this is October 10th -- she had no narcotics in her system.

Shortly afterwards, she gets a text from Mr. Bourdo that says, "It's Bourdo," providing her a phone number, and then her phone geolocates to 90 North Warren where she ODs on crack cocaine and fentanyl. It's unclear when she arrives here, but she's actually revived from that incident. She's put on ice, she's given CPR, she's given chest compressions, and eventually she comes out of it.

What we learned is that just prior to arrival at the house on October 10th, 2021, she had been in rehab. She had been clean for four months. It's the four-month period that her family talks about. She got out and began the initial part of her relapse.

The next day, on October 11th, she leaves 90 North Warren. It appears that she's going out to Sullivant Avenue to

31

make money the way that we know that these drug traffickers capitalized on drug-addicted women.

And then she comes back on October 12th, and on October 12th there are numerous phone calls between her and Mr. Bourdo.

So the kind -- I read the sentencing memo, and this concept of he kicked her out, didn't want her there, is really not what we see as reflected in the phone records that were left behind on the phone he tried to take.

I'll note that they continued to communicate. There were text messages. She was invited by him back to Grace and Warren. At which point, she indicates to somebody that is not involved with this, "Hey, I just got my drugs here." Grace and Warren is 90 North Warren, the spot that Bourdo supplies. "Do you want to go make some money? I'm about to head out to Sullivant Avenue." Again, which we know what that means here in this case.

Her last call that she receives is at 2:38, and the following morning the 911 call at 10:04 a.m. on October 14th leads us to finding her body in an alley.

The timestamp of a video at 10:09 a.m. shows Mr. Bourdo holding a phone in his hand, talking on it, and walking towards her body. You then see police lights, hear police sirens, and he's seen, what I would argue, walking quickly in the opposite direction away from her body.

32

A phone was recovered off of her person, and that phone evidence led us to show that at 90 North Warren she overdosed twice on the drugs that Mr. Bourdo provided.  Which is why when we talk about that plea of guilty, whether or not he's the person that gave her the small amount of user narcotics that she requested really is irrelevant.  He's the one that supplied everybody the drugs.  He was the drug dealer for the west side at that address and so many other locations.

I also want to talk a little bit about the conspiracy to commit sex trafficking.  Because aside from the absurd amount of drugs that were distributed by this group -- fentanyl, cocaine, and crack cocaine, to say the least -- they were engaged in the conspiracy to commit sex trafficking.

And oftentimes, especially throughout this case, my partner and I have had to have conversations about what sex trafficking means.  In fact, in the jury trial that was held before Your Honor with Mr. Bourdo's co-defendants there was an expert that was brought in because everyone has a misconception about sex trafficking.

They think this is some drug-addicted, insert some derogatory term, who is doing this to herself.  She's a whore.  She is this.  She is that.  She's making these decisions to do this on her own.

But what we learned is that is not the case; that the addiction controls the decisions that these various female

33

victims have made, and the drugs control them. And who controls the drugs in this case? Mr. Bourdo. He took advantage.

So while we don't have evidence that he ever put his hand -- no violent act against one of the girls, the notion that he's removed from this conspiracy because he wasn't violent and he gave them breakfast and he gave them a place to live and he gave them food, feeds right into the theory that he is, in fact, conspiring to commit sex trafficking by coercing them to come back. Because for the first time they have clothes, they have food, they have shelter, and they have consistent access to drugs; and that is the manipulation tactic that was used here by Mr. Bourdo.

Finally, I'll end on the fact that this climate of fear that we talked about is so important when Your Honor is considering what sentence to give him. And, again, the government would submit that 25 years is the most appropriate sentence in this case when you look at the factors.

But this climate of fear has continued on throughout the time of his incarceration. Every single person who has something to say about Mr. Bourdo talks about how he glorified the drug life. He basked in it. He was well-known on the west side, and he was the enforcer.

Almost every individual, co-defendant, co-conspirator, or individuals who had insight into this, will tell you that

34

the most violent individual in this drug trafficking organization was not Dustin Speakman, who beat Chris Slone to death, it was Tyler Bourdo, and it was consistent.

You know, we talk about -- in the PSR, some of these acts of violence are outlined; but it's the purposeful embarrassment, the beating of the various drug addicts that he came into contact with just for fun.

He learned -- it's the government's submission that he learned nothing from the classes and certificates that were submitted on his behalf because since then, for the last six months, in Government's Exhibits -- I think it's Exhibit E in the sentencing memo, we have approximately 65 pages of violations related to his actions while incarcerated: Insubordination, drug using, Suboxone using -- and we learned all about Suboxone, about how it's still a drug that is used as a tool to feed your addiction -- fights.

And I won't go into all the details, but there are 65 pages of absolute violations from the time he's been incarcerated.

In addition, he has also put individuals in this case in significant jeopardy because of how he's talking about this case. What I mean by that, back when his motion to revoke phone privileges was filed, there was a case -- and it's now filed, I believe, on the public docket, so I'm going to talk about it -- involving somebody by the name of Mr. Dennis

35

McNamara. Mr. Bourdo was actively involved in threatening the client of Mr. McNamara believing that she was snitching.

THE COURT: I have to stop you. That's not in the presentence.

MS. CZERNIEJEWSKI: I believe it's in the sentencing memo.

THE COURT: Your sentencing memo.

MS. CZERNIEJEWSKI: Yes. I guess I would proffer that information.

THE COURT: I'm a stickler about this because, first, there's so much in the presentence report, I don't need to go an inch beyond that.

MS. CZERNIEJEWSKI: That's fair, Your Honor.

THE COURT: Having said that, I don't want the Court of Appeals to say that we went into facts, and I relied on those, that weren't either agreed upon or objected to with me resolving them.

By the way, I had involvement in everything we're describing. So I know exactly what you're talking about, but I am going to cabin myself to what's in here, and there's plenty in here.

MS. CZERNIEJEWSKI: Thank you, Your Honor.

And I should say, when I talked about the filing, these are the facts that are agreed on between the parties. It was a joint motion to revoke phone privileges, and these facts

36

are laid out.

MS. KHAN:  We didn't agree to the facts.  We agree that he lose his --

THE COURT:  Yeah.  I'm just being cautious here.

MS. CZERNIEJEWSKI:  Okay.

THE COURT:  I think we can leave that for now.

MS. CZERNIEJEWSKI:  All right.  Then I will move on from that.

But even afterwards, as submitted in the government's sentencing memo, there are information or communications where he was constantly speaking about who was cooperating in this case to other cooperators.

There was another instance -- and, again, I'll just kind of generalize -- where an individual was attacked in jail because they believed he was cooperating based on what Mr. Bourdo submitted to other inmates.

What I'm saying is that when you plead guilty to offenses as serious as these are and you are remorseful and you are coming before the Court asking for the lower end of a sentence that's agreed upon between the parties, the behavior and the evidence since then really indicates the opposite. It's exactly who we know Tyler Bourdo to be throughout the course of the investigation.

I don't ever want to take away from what Mr. Bourdo has been through in his life.  I read the PSR.  I read the

37

psychological. I read the sentencing memo. He has had an extremely hard upbringing, an extremely tumultuous background. But since then, since the treatment, since the help, since the psychological, I mean, he's had numerous opportunities in the criminal justice system to get on the straight and narrow. We're still seeing a consistent pattern of creating a life of fear and glorifying this life.

When we talk about the factors that Your Honor is to consider, obviously nature and circumstances of the offense charged is in constant battle with the history and characteristics of the individual sitting before you; and I think that normally history and characteristics of the individual goes in favor of the defendant based on the significant diagnoses or issues that he had.

But here we have the benefit of looking forward at everything he has continued to do, despite the services that have been in place, despite the diagnoses, despite the medication. I'm just noting that there's concerns about how the history and characteristics have led him to continue to be this -- creating this climate of fear.

I also want to talk about the statutory purposes of sentencing and the need to avoid unwarranted sentencing disparities.

THE COURT: That's where I have some questions there for you. Again, part of my role is to see people in an

organizational crime as to where they're located, and you're going to help me do that.

Let's talk about one of the two people at the top. Now, he cooperated with the government, and people get a benefit for that. The law is very clear. So he's not in the same category as this defendant, but Mr. Saultz, as I recall, he's looking at a 27- to 30-year sentence unless something else happens in other cases.

MS. CZERNIEJEWSKI: That's correct.

THE COURT: And we would put him above Mr. Bourdo.

MS. CZERNIEJEWSKI: That's correct.

THE COURT: And his sentence is still above this range.

MS. CZERNIEJEWSKI: That's correct.

THE COURT: But you would argue that he is a much bigger player. He wasn't charged with killing anyone with fentanyl, and he's cooperated.

MS. CZERNIEJEWSKI: That's correct.

THE COURT: So tell me how else you see this defendant fitting in that structure.

MS. CZERNIEJEWSKI: Yes. So when we look at somebody like Pat Sault who pled guilty to 27 to 30 years, there was no direct evidence that Pat was ever violent, and I think that came out throughout the trial. Nobody ever testified about any violence. In fact, that's why he was so successful for so

39

long.

That is the complete opposite trait of the defendant. He ruled with an iron fist versus kind of a compassionate demeanor, and they took advantage of the addicts that they came across in different ways. So when we talk about the sentencing, I'll note that the way that they both ruled the drug trafficking organization was completely different.

The other thing I will say is Mr. Bourdo pled to an overdose death. The mandatory minimum on an overdose death in federal court is 20 years, which is the bottom of the range.

THE COURT: If it's charged that way.

MS. CZERNIEJEWSKI: As charged, yes.

THE COURT: I mean, you had reason for this, but it's not charged that way here. This is a guideline.

MS. CZERNIEJEWSKI: This is a -- well, there's an agreed sentencing disposition, but if you look at the penalties outlined in the --

THE COURT: And you're over the 20 years. I see your point.

MS. CZERNIEJEWSKI: Yes.

So we're starting really at the bottom of the lowest number that we can go. And I think when you look at the charges in this case, the way the defendant has continued to act, and the way that these crimes were committed, that this was not the least exacerbated way to commit these crimes, which

40

is why we are asking for the above -- the top-end range of that 25 years.

So when we talk about unwarranted sentencing disparities and individuals who plead guilty to overdose deaths in nondrug trafficking organization cases, so defendants not related to this specifically, 20 years is the bottom that they're facing, so anything above that isn't a disparity. But as it relates to this, I think that there is a huge difference -- I'll go back one sentence.

Cordell Washington in this case is facing 15 to life, and he was the other top guy, also not violent. So we have a different --

THE COURT: He doesn't have an 11(c)(1)(C).

MS. CZERNIEJEWSKI: He does not have an 11(c)(1)(C), but we're starting at 15 for here, up to life, and his guideline range is life.

THE COURT: Was Pat Saultz convicted of the same counts?

MS. CZERNIEJEWSKI: He was not.

THE COURT: He was convicted of conspiracy to traffic drugs.

MS. CZERNIEJEWSKI: Yes, conspiracy to commit money laundering and conspiracy to commit sex trafficking.

THE COURT: Not the "death due to." Everything but that.

41

MS. CZERNIEJEWSKI:  That's correct.  That's correct, with the addition of the money laundering.

So, again, when we look at the range here, the details of the plea agreement are extremely long.  This is a lengthy, detailed statement of facts.  But when we look at the actions of the defendant, both before, during, and after the plea agreement was signed, and the range which is -- again, we talked about that certainty in sentencing, and I mapped out all of the reasons why the deviation from the guidelines here, and the acceptance of this plea agreement is important because there's certainty to the family and the victims of the sex trafficking.

I want to go back to that.  You know, we have had conversations with the individuals who lived at 90 North Warren who were paid in drugs and manipulated to use their house.  We have had conversations with some of the females, the victim specifically of Tyler Bourdo who resided at 430B South Warren and was often committing -- engaging in sex acts numerous times a day to benefit the defendant, that the range as stated provides some type of ending to this trauma -- this saga of trauma that they have endured.

But then when you decide how to sentence the defendant within that range, really the only appropriate sentence in this case is the 25 years.  And based on that, we're asking Your Honor to impose that sentence here today.

42

THE COURT: You're not done yet.

MS. CZERNIEJEWSKI: Okay.

THE COURT: There's also an issue -- so the sentencing guidelines are designed to pick up all the relevant conduct, and this is conspiracy over a number of years. And within those years, we have a two-year state court sentence on drug trafficking that's part of this conspiracy. I don't think anybody would disagree.

Now the question becomes what to do with those two years. Should I ignore it and sentence this cold, or should I consider it?

MS. CZERNIEJEWSKI: I think that the time the state court sentence was served, that predated the charges in this case, and I believe that that's a -- that guideline that governs that -- and I did research, and I found very little, like Ms. Mueller -- is more of a policy statement rather than a guideline.

THE COURT: Well, the larger conspiracy was longer. Is there a -- you mentioned a year and a half in this case.

MS. CZERNIEJEWSKI: Yes.

So when we -- I think that we can -- the investigation definitively indicated that Mr. Bourdo, based on his time in and out of jail, began distributing drugs for this group in January of 2021, which came after the state court sentence.

So I would say that that two years should not be

attributed --

THE COURT: Well, the other would be, if I considered it, in the middle of this conspiracy he serves two years and comes out and does it again.

MS. CZERNIEJEWSKI: That's correct, which is a reason not to give him credit for that because there was no lessons learned again.

THE COURT: Okay. Thank you.

Ms. Khan -- go ahead.

MS. CZERNIEJEWSKI: I'm sorry. I did not mention this, but we are seeking restitution as outlined in the sentencing memo for the funeral costs.

THE COURT: Let's talk about that for a moment.

So you are asking for $12,784.

MS. CZERNIEJEWSKI: That's correct, Your Honor.

THE COURT: All right. Just one moment.

All right. Anything further?

MS. CZERNIEJEWSKI: Nothing further. Thank you, Judge.

THE COURT: Ms. Khan, you may have the last word if you wish.

MS. KHAN: If I can just have a moment, Your Honor?

THE COURT: Sure.

(Defense counsel conferring with client off the record.)

MS. KHAN: I think with respect to the relevant

44

conduct, we all agree that that was relevant conduct.  For those reasons, we would submit that it should be that the Court should consider --

THE COURT:  You want to know what's on my mind.  I'd like to give you a chance.

So it does seem like relevant conduct because it's all part of the same -- the dates are a little bit different, but generally speaking that's not the only thing the probation officer would pick up.

But at the same time, he's caught, he serves two years in state prison, but then he comes back out and starts all over again.  So it's hard to see why I would want to credit that.

MS. KHAN:  Well, I mean, I think that what we understand is that he was involved before and after.

THE COURT:  Right.

MS. KHAN:  And that, you know, the quantity, all the other conduct that had been going on during that time period, all the exacerbating things that they have discussed, happened in that duration of time.  We would submit that he should get the two years.

And, again, with respect to the sex trafficking, I think -- he's pled guilty.  I mean, we have agreed to accept responsibility, with the really tremendous amount of time.  So to submit that he's not accepting responsibility or he doesn't get it or he's being --

45

THE COURT:  You won the objection on that, and the government -- so he's gotten the acceptance credit.

MS. KHAN:  Thank you, Your Honor.

But moreover, the government's position is, well, he should be on the top end because he just doesn't get it or he's not showing remorse.  He absolutely is showing remorse.  He, like everybody else involved here, was an addict, and his behavior was consistent with everybody else around him.

I'm not saying it's right.  I'm saying that on the continuum, everybody's involved in this, everybody knew what was happening, everybody was aware of the sex trafficking activity.  It wasn't exclusive to him.  He was on the chain. It wasn't his idea.

And while, yes, he did do things that he thought would be helpful to some of these women, giving them clothing, shelter, food, without an appreciation of this is part of the manipulation, okay, we get it.  That's why he pled.  That's why we have agreed to that.

But to say, oh, he still doesn't get it, that's why we're here.  That's why he's eating it.  That's why we didn't have a trial about it.

And the same thing goes for delivery of these drugs. Those drugs, we all agree, came from Pat Saultz, and so he shouldn't get the extra -- he's eating the 20.  He's starting at the 20.  He shouldn't get the extra bump for being solely

responsible.

And I would further submit, Your Honor, all those death results counts, you know, on the -- under the best of circumstances, this Court very rarely sees people that are actually eating the flat 20 with no -- if it's under the most innocent of circumstances.

THE COURT:  To be honest with you, the ones that I have had -- and the government didn't charge the 20-year mandatory.  This could come in a lot of shapes and sizes, but I want to be clear on this.

MS. KHAN:  Yes.

THE COURT:  I have had a case where four or five people are using drugs together.  One of them goes and buys some fentanyl, and one of the four die.  That's when the government hasn't charged the 20 years because -- that's bad, but that's not a major-league drug trafficker that has killed somebody.

I'm not so sure that's not what we have here though.  This is multiple sales of fentanyl to multiple people.  This is not somebody who is just using the same drugs and it just happens to be -- I would never call this an accident.  With the four people I'm talking about, that's really bad luck.  But there are a lot of places in the law where if you do something illegal and you end up killing somebody, that may not have been anywhere near your intent, but you're still punished for

47

killing somebody.

MS. KHAN: Certainly, Your Honor. For those reasons, we would submit that 20 is more than enough.

The government is also seeking this extended supervised release, and I think that that's actually a good idea; that if he does the 20, he gets out, he has an opportunity to be able to demonstrate that he's getting it, he is benefiting from the treatment, that would be a tremendous hammer hanging over his head during that duration of time. We don't have any issue with that.

With respect to the restitution, Your Honor, we had agreed with the -- to the restitution relating to S.B. We didn't receive any documentation relating to any other restitution. We have agreed to it in the plea agreement. If we see some documentation supporting that, then we would consider it and certainly --

THE COURT: Well, just so I'm clear, the original number was in the 9,000 range --

MS. KHAN: Yes.

THE COURT: -- and it's the extra three that you would like documentation for.

Can you help with that, Ms. Czerniejewski?

MS. CZERNIEJEWSKI: Yeah, Your Honor. You know, we have spoken, and I have -- there's advocates here from the Salvation Army that have helped me try to communicate with the

48

owners of 90 North Warren, C.F., and D.H., who were taken advantage of as addicts at the time that Mr. Bourdo operated their house; and with the victim in this case, Jane Doe 3. They don't have documentation saying this is how you hurt me. It's just we just gave the most minimal amount of losses that we could reasonably foresee.  There's no piece of paper that I can provide.

THE COURT:  Why don't we leave it like this:  I'm going to order the lower number.  You have got 90 days to finalize.  You either agree or we will have a hearing on the addition.

MS. CZERNIEJEWSKI:  Perfect, Your Honor.  Thank you.

MS. KHAN:  We would also ask, Your Honor, in light of the fact that Tyler is indigent, that the order of restitution be enforceable after -- after his release.  Because while he's in prison, the only income that he's going to be getting is from family members for phone calls.

THE COURT:  Well, correct me if I'm wrong, either of you, he will be earning some money in prison.  That, I know.

MS. KHAN:  He will be -- yes.

THE COURT:  And it would come from that.  If people put money into his commissary account, I don't think that's garnishable by the government.

Ms. Mueller, would you happen to know?

MS. KHAN:  My understanding is it is and it has been.

49

THE COURT: I remember an audit of the Bureau of Prisons where people had thousands of dollars and none of it was going towards restitution because it was money sent in, not earned by the inmate.

MS. CZERNIEJEWSKI: That's correct, Your Honor. And I just want to note also, pursuant to 18 U.S.C. 3663A, I believe, a finding of indigency does not remove the obligation because the restitution --

THE COURT: It's always mandatory, but I'm not going to defer it for the length of the sentence. That's just too long, because this is money going to the victim's family.

MS. KHAN: If the Court's position is that the only source of the restitution payments come from the money that he's earned, we don't have an objection.

THE COURT: Well, the only thing I can tell you is I don't think I have that kind of authority over the Bureau of Prisons, so that's the best I can do.

MS. KHAN: We would also ask Your Honor for a placement at Allenwood.

THE COURT: Allenwood?

MS. KHAN: Yes, Your Honor.

THE COURT: All right. I will do that.

MS. KHAN: And if you could also, Your Honor, include it in the statement of reasons, that request for that designation.

50

THE COURT:  I'll do that.

MS. KHAN:  Thank you.

THE COURT:  And I'm going to recommend the RDAP program as well.

MS. KHAN:  Thank you.

MS. CZERNIEJEWSKI:  And, your Honor, one last thing. I apologize.

I believe Ms. Khan and I talked about the offense of conviction.  It's listed as 18 U.S.C. 1591(a)(1).  The title of that statute says sex trafficking of minors or by means of force, fraud, or coercion.

So if you Google that statute or look it up in any court database, it starts with saying sex trafficking of a minor.  I don't know if there's any way to indicate that there's -- on any orders that there's no minors involved in this case.

THE COURT:  Well, we can put that in the judgment of commitment order if you like.

MS. CZERNIEJEWSKI:  Thank you.

MS. KHAN:  I think one of the primary concerns there is that he would -- he not be limited to access to phone privileges.

THE COURT:  That would change a lot of conditions, that's true.

MS. KHAN:  Thank you, Your Honor.

51

MS. CZERNIEJEWSKI: Thank you, Judge.

THE COURT: Mr. Bourdo, if you would please stand.

Tyler N. Bourdo is before me for sentencing after pleading guilty to three offenses: Count 1, conspiracy to distribute and possess with intent to distribute controlled substances within 1,000 feet of an elementary school; Count 2, distribution of fentanyl and cocaine base resulting in death; Count 3, conspiracy to commit sex trafficking.

The Supreme Court case of *Booker v. United States*, district judges are directed to do a three-step analysis in determining the appropriate sentence.

The first is for me to compute the sentencing guideline range, which we have done. In addition, there is a plea agreement the parties are bound by that directs me to a sentence not to be below 240 months, or 20 years, and not to be above 300 months, which is 25 years.

The second part of the sentencing regimen is to look at the guidelines themselves to determine if any appropriate departure grounds are warranted. I find there are none.

I am going to reject the argument that I should count the two years in state court -- in prison on state court charges, for the simple reason that if he had rehabilitated after that, I probably would have credited it, but that's not what happened in this case. He finished that state sentence for what could be part of this conspiracy; but upon release, he

very shortly thereafter continued on the illegal conduct.  So I'm not inclined to give the credit.

The third set of factors are where the judgment come in.  There are seven sentencing factors in the federal criminal code.  They oftentimes pull in different directions, and I'm to consider each one of them in coming up with the appropriate sentence.

The first one has two parts.  I'm to look at the nature and circumstance of the offense, and then I'm to also look at Mr. Bourdo's personal history and characteristics.  The offense conduct in this case is lengthy and detailed, and I compliment probation officer Emily Mueller for a very good report.

I do want to spend some time, though, talking -- I'm going to adopt all of the findings, first of all.  But I'm also going to give some summary of what we're talking about.

There are three major offenses here.  The first one is drug trafficking.  And we have talked, because this case involves the death through drug trafficking, the quantity of drugs doesn't drive the sentence as it usually would.  But at the same time, in looking at all three of these, I can't get an appropriate sense of what a sentence should be without some sense of how much drugs we're talking about.

In a fairly short period of time, 17 months, there were enormous amounts of drugs sold:  51 kilograms of fentanyl,

which is an enormous amount of a very deadly drug; multiple kilos of cocaine and crack; and as the packs are known, also Percocet and Xanax. So this was a major drug trafficking operation, if I look at just what Tyler Bourdo was responsible for. And of course he was part of a larger group that sold even more drugs, primarily on the west side of town.

And I want to spend a moment on this. We went through this this morning in another case that involved someone dying. This was ground zero, and still is, for fentanyl deaths in this county. The year that this case primarily took place, 2021, just in Franklin County there were 893 overdose deaths, and close to 90 percent of them came from fentanyl. This is exactly the crime we're talking about, selling a drug that's not only highly illegal, highly addictive, but also highly deadly.

So that's part of this case when we're looking at only the first part of this case.

And then the tragedy involving Sarah. This is an awful case to read about. She seemed like a wonderful young woman. And I just want to say to the family that there are many people who come through here addicted and get cured, and this death prevented that opportunity for Sarah. I'd like to think she was on her way.

People don't generally become highly addicted and then become unaddicted. It's a bumpy road. People relapse. They

54

come back. They keep trying. They may relapse again. But many, many people have come through here and done extremely well after years of addiction, and she could have been in that group.

The facts of her death are gripping. She's left in an alleyway. The cause of death, by a pathologist, is cocaine, fentanyl, fluorofentanyl, and xylazine, a veterinary-used sedative.

So all very sad from a person who seems to be a very wonderful person. Sad for her condition in the first place, even sadder that her end was this way.

The third offense, sex trafficking, another serious offense. And at a trial unrelated to Mr. Bourdo, but nonetheless education to the Court, exactly what the presentence report describes: That people become addicted. People have no place to stay. They don't have a steady source of drugs. Enter Mr. Bourdo, and suddenly they're at his beckon call under his coercion, and here we are.

So all three of these are serious enough to give a very stiff sentence just by themselves, and in this case we have three.

I'm also to look at Mr. Bourdo's history and characteristics, and there's really -- Mr. Bourdo was dealt a very bad hand, I would begin by saying. His parents were teenagers when he was born. There was lots of domestic

violence in his house. His father was a drug user. He was sexually abused himself. He started using cocaine at the age of 12, which is hard to believe. But I take him at his word for another corroborating fact, and that his criminal history.

I've sentenced a lot of people. Very few have criminal histories at the age of 12, but that's Mr. Bourdo, and that's a very sad fact.

Mr. Bourdo, that tells me that family life was falling apart.

I'm going to review just generally the prior offenses because there are many. He had an offense at age 12. He had another criminal conviction in juvenile court at age 13. The first one was for domestic violence; second one was assault. Actually, it was age 14, to be precise.

But the list goes on and on. There's assault; felonious assault; underage drinking; unauthorized use of property; disturbing the peace; theft; possession of drugs; open container; possession of drugs; possession of heroin; disorderly conduct; drug abuse; menacing; possession of cocaine; drunk driving; and, finally, the matter we talked about, the possession of cocaine.

The criminal history category is III, which frankly is on the low end, given the criminal history; but it does not have a major effect on the sentencing that we're discussing.

There's a long report -- which, Counsel, I always find

56

helpful -- from a Dr. Mekota.  He is a psychologist, and he spent a fair amount of time with Mr. Bourdo, interviewing him, giving him a number of psychological and behavioral tests to get an indication of his mental health makeup, which I would describe as extremely poor.  Not a surprise, in light of all of his childhood trauma.

I could spend quite a bit of time talking about this very thorough report, but I'm going to summarize it.  He describes a person with a childhood ripe with instability, violence, and exposure to drugs, making him ill-equipped to care for himself or meet his own needs.  He was frequently moved between households, also in foster care, physically abused by multiple adults, sexually abused, exposed to drug abuse, et cetera.  And the doctor says, correctly, that this kind of exposure in childhood leads to significantly greater risk for future abuse and dependency on drugs.

So his final diagnoses lists five different major medical disorders:  Post-traumatic stress disorder; major depressive disorder; opiate use disorder, severe; cannabis use disorder, moderate; cocaine use disorder, severe.

So that corroborates both what Mr. Bourdo told the probation officer, what his criminal history reports as well, and to some extent gives some insight as to how this crime happened.

So oftentimes, Mr. Bourdo, if you had this kind of

57

background and we were looking at a nonviolent offense, I might be thinking seriously about months of mental health treatment, inpatient drug addiction treatment. But there's a death here, there's a lot of violence, and there's a lot of drugs. And these two are to be balanced, but in some cases one completely overweighs the other, and this is the case.

The second set of factors I'm to consider are also in a series. I'm to make sure that the penalty here imposed reflects the seriousness of the crime; promotes respect for the law; and this is a big one -- in federal court this is oftentimes not a big factor with the kind of cases we typically see -- but this one says I'm to make sure I'm the public is protected. With everything in this case, including the death of Sarah, that, in the Court's view, is a big factor.

I'm also to look at any sort of remedial care you need. That's why I'm thinking of the drug abuse program. That's a very thorough one that hopefully you will be eligible for.

I am to look at the kinds of sentences available, together with any statements made by the Sentencing Commission that might bear on this case. I'm not aware of any. The guidelines have not been criticized by the Commission.

And then what we have discussed at some length, I am to make sure that the sentence imposed does not represent an unwarranted disparity. That's another way of saying that

58

Mr. Bourdo should be sentenced consistent with his conduct the way other people in similar situations are sentenced as well.

We have discussed the issue of restitution, and what I have already said and what the parties have agreed upon to do will be the order there.

So there's a lot to pack in in this case. But with regard to Mr. Bourdo, as I mentioned, there are three serious types of convictions here, any one of which would carry an extremely heavy sentence. The death due to a drug trafficking sale carries a 20-year mandatory minimum. Even though it's not charged that way, the offense that he's convicted of has a sentence all the way to life.

The sex trafficking has a 15-year mandatory minimum, and the drug trafficking quantities also would take the guidelines far into the range close to life imprisonment.

So with all of these factors in mind, it will be the judgment of the Court that Tyler Bourdo will serve a term of 300 months with regard to Counts 1, 2, and 3. They will be served consecutively, for a total of 25 years.

With regard to his placement in the Bureau of Prisons, I recommend that he be placed in FCI Allenwood; that he also be considered for the residential drug treatment program; that he have a full mental health assessment upon his arrival at the Bureau of Prisons and be accorded any treatment recommended by that assessment.

I find no ability to pay a fine. The restitution we have already discussed. I am going to order a special assessment in the amount of $300. There are a number of items, including firearms and cash and phones and an automobile, that will be forfeited pursuant to the plea agreement.

With regard to special conditions, there are a number listed in the presentence report, all of which I am going to adopt. First, he will participate in a program of testing and treatment for alcohol and controlled substance abuse directed by his probation officer, and the same in the second condition with regard to mental health.

Third, he will participate in a sexual offender treatment program, to include risk assessment, psychosexual evaluations, and/or other evaluations; and he will also sign the necessary authorization for periodic polygraph tests, and he will pay for these services.

If unemployed, he will participate in vocational services programming as directed by his probation officer. I'm also going to make that a recommendation to the Bureau of Prisons, that he receive some type of vocational training during his term of confinement.

Are there any other sentencing issues either side would like to address?

MS. CZERNIEJEWSKI: Nothing on behalf of the United States.

60

MS. KHAN:  No, Your Honor.

THE COURT:  All right.  And there's a waiver of appeal.  So, Ms. Khan and Mr. Long, I'll task you, sometime after today, to discuss that with Mr. Bourdo.

With that, we'll be in recess.  Thank you.

I'm sorry.  One matter.

MS. MUELLER:  I don't know if I caught the term of supervised release.

THE COURT:  Term of supervised release will be 10 years.  Thank you.

THE COURTROOM DEPUTY CLERK:  All rise.  This court stands in recess.

(Proceedings concluded at 2:50 p.m.)

- - -

61

C E R T I F I C A T E

        I, Crystal Hatchett, RPR, CRR, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the HONORABLE EDMUND A. SARGUS, JR., Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


                        s/Crystal Hatchett_____
                        Crystal Hatchett, RPR, CRR
                        Official Federal Court Reporter
                        April 3, 2025